UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------
DAVID BARON,

                       Plaintiff,                   **MEMORANDUM AND ORDER**
                                                         **11-CV-2155 (DRH)(AKT)**

    -against-

ADVANCED ASSET AND PROPERTY
MANAGEMENT SOLUTIONS, LLC,

                  Defendant.

----------------------------------------------------X

**APPEARANCES:**

**For the Plaintiff:**
**LAW OFFICES OF MICHAEL G. O'NEILL**
20 Vesey Street, Suite 301
New York, NY 10007
By:    Michael G. O'Neill, Esq.
         Aaron N. Solomon, Esq.
         Theresa Bui Wade, Esq.

**For the Defendant:**
**ECHERT SEAMANS CHERIN and MELLOTT LLC**
10 Bank Street
White Plains, NY 10606
By:    Riyaz Gulam Bhimani, Esq.

**ECHERT SEAMANS CHERIN and MELLOTT LLC**
1717 Pennsylvania Ave. Nw, 12th Floor
Washington, DC 20006
By:    Jeffrey W. Larroca, Esq.
         Nicholas T. Moraites, Esq.


**Hurley, Senior District Judge:**

    Plaintiff David Baron ("plaintiff" or "Baron") commenced this action against Advanced

Asset and Property Management Solutions, LLC. ("AAPMS" or "defendant") for violating the

Americans with Disabilities Act ("ADA") and New York's Human Rights Law ("NYSHRL") by terminating plaintiff's employment because of his disability. Presently before the Court is defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, defendant's motion is denied.

*Background*

The following material facts, drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

In March, 2009, AAPMS, a property management company, hired plaintiff as an Assistant Controller for its office in Uniondale, New York. Plaintiff's job duties included, among other things, reviewing monthly financial statements and cash forecasts and handling corporate general ledgers and reporting for properties. Plaintiff replaced his predecessor, Elana Morin, who was fired due to poor work performance. Plaintiff notes that his hiring form clearly indicated that he was hired to replace Morin.

*Plaintiff's Work Performance*

The parties disagree as to the quality of plaintiff's work product. Defendant claims that Baron displayed "[s]ignificant work performance issues [that] began to occur shortly after [his] hire" and persisted throughout his employment. (Def.'s R. 56.1 Stmt. ¶¶ 4, 5.) According to defendant, plaintiff had difficulty generating cash forecasts. Additionally, defendant asserts that plaintiff was late cutting checks and issuing management fees, made errors on cash sheets, struggled in transferring data, failed to timely deliver weekly cash management or other reports, failed to deliver accurate cash management reports, entered spreadsheet information incorrectly, and made formula errors. According to defendant, plaintiff made errors on at least a weekly basis, failed to file a single monthly property management report in a timely fashion, failed to

enter all transactions on a daily basis, and failed to correct errors or improve his performance. Generally, plaintiff denies these allegations and asserts that the troubled relationship between two of plaintiff's supervisors, Charles Zerbo ("Zerbo") and Dana Connelly ("Connelly") caused many of these alleged problems.

*Plaintiff's Disability*

In 2009, plaintiff developed aortic insufficiency caused by aortic valve leaking resulting in an insufficient volume of blood ejected through the aortic valve. In the middle of 2009, plaintiff's disease became so severe that his treating physician referred him to a cardiothoracic and vascular surgeon for an aortic valve replacement. About five or six weeks before he was terminated, plaintiff was advised by his doctor that he needed open heart surgery. It is undisputed that plaintiff is no longer disabled and currently has no physical limitations.[1] It is also undisputed that plaintiff's alleged disability did not affect his job performance.

*Plaintiff's Termination*

According to defendant, as a result of plaintiff's poor performance, defendant hired Esmeralda Vicente ("Vicente") to replace plaintiff. Defendant claims that discussions regarding plaintiff's termination began weeks prior to June 25, 2009, the date it placed the ad that resulted in Vicente's hire, and before defendant was aware of plaintiff's heart condition. According to defendant, plaintiff never informed anyone at AAPMS about his medical condition other than Zerbo, and that was not until after June 25, 2009.

Plaintiff contends, however, that Vicente was not hired to replace plaintiff and notes that the "Human Resources Action Form," which was generated when defendant hired Vicente, noted that Vicente was 'an addition to staff,' and she was given the title of Senior Property Accountant

---

[1] Plaintiff does not dispute the truth of this statement, but only asserts that it is immaterial.

as opposed to plaintiff's former title of Assistant Controller. Moreover, plaintiff claims that the decision to terminate him was made after defendant hired Vicente, and after it became aware of plaintiff's alleged heart condition. In particular, plaintiff claims that he had conversations with Zerbo regarding his heart condition, and that he told Zerbo about the need for his surgery approximately 5-6 weeks prior to his termination. In addition, plaintiff contends that on one occasion, Zerbo told plaintiff that he would be reporting to Vicente, and when plaintiff asked Zerbo if he was going to be terminated, Zerbo replied, "you're sick and this is a business decision." (Pl.'s R. 56.1 Stmt. ¶ 52.) Defendant denies this allegation, and Zerbo testified at his deposition that "if [he] said anything [at that time], [he said] it's a business decision to demote you down, it has nothing to do with you being sick." (Def.'s R. 56.1 Response ¶ 52.)

Defendant claims that Vicente started work with defendant on or about August 9, 2009, and although at that time plaintiff was still an employee, Vicente was to transition into plaintiff's position. According to defendant, however, it decided to end the transition period and terminate plaintiff because he signed, without authorization, 20 checks totaling over $40,000 on or about September 14, 2009. Plaintiff does not dispute that he signed the checks, but contends that Connelly authorized him to sign the checks. Plaintiff was officially terminated on September 18, 2009.

*Preservation of Evidence*

Plaintiff alleges that defendant failed to sufficiently preserve relevant evidence because Annette Givelekian, defendant's Vice President of Human Resources, never instructed defendant's IT Department to recover emails relating to plaintiff. Defendant admitted in discovery that the only thing it did to preserve documents relating to plaintiff's claims following notice that plaintiff intended to make a claim against defendant was to request that all emails

concerning plaintiff's termination and work deficiencies be printed out and provided to Ms. Givelekian so that the emails could be maintained. Ms. Givelekian kept any emails that were printed out and provided them to plaintiff in discovery. Moreover, plaintiff claims that the emails produced by defendant represent only a tiny fraction of the emails that were exchanged amongst plaintiff, Zerbo, Connelly, and others throughout plaintiff's employment. Plaintiff claims that the missing emails would show that the problems that defendant blames plaintiff for were actually caused by external factors and that the emails would have referenced tasks that plaintiff had successfully completed.

## DISCUSSION

### I. Applicable Law and Legal Standards

Summary judgment pursuant to Rule 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or

other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts*," Aslanidis v. U.S. Lines, Inc*., 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not implausible." *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of N. Y.*, 224 F.3d 149, 157 (2d Cir. 2000),

and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II.  Plaintiff's American's with Disabilities Act Claim

### A.  *Legal Standard*

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* prohibits employment discrimination by a "covered entity ... against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Employment discrimination claims under the ADA are evaluated under the now familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805 (1973). Under *McDonnell–Douglas* and its innumerable progeny, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell–Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non;" and thus, (3) the burden

shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (internal quotation marks and citations omitted). "For a disability discrimination claim under the ADA, a plaintiff must demonstrate that her disability was at least 'a motivating factor' for the adverse employment action."[2] *See Wesley-Dickson v. Warwick Valley Cent. School Dist.*, 2013 WL 5338516 (citing *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 336–37 (2d Cir. 2000)). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) his employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. *See Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Cmty Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir. 2003)); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 99 (2d Cir. 2003).

"For the most part, the ADA and the NYSHRL are construed similarly, and the clear legislative purpose in drafting the NYSHRL was 'to enact a definition of disability coextensive

---

[2] In *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009), the Supreme Court held that in order to withstand summary judgment, a plaintiff claiming a violation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*, must raise a triable issue that age was the "but for" reason for the adverse employment action. Despite the similarities in language between the ADEA and the ADA , the Court will not extend *Gross* to ADA cases absent guidance from the Second Circuit. *See Najjar v. Mirecki*, 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013). Moreover, defendant does not argue that the *Gross* standard applies here.

with comparable federal statutes." ' *Burton v. Metro. Transp. Auth.,* 244 F. Supp . 2d 252, 257 (S.D.N.Y. 2003) (quoting *Reeves v. Johnson Controls World Servs.,* Inc., 140 F.3d 144, 155 (2d Cir. 1998), *superseded by statute on other grounds as stated in Hilton v. Wright,* 673 F.3d 120 (2d Cir.2012)). Moreover, summary judgment motions under the NYSHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as ADA claims. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir. 2000). Although claims under the ADA and the NYSHRL are both analyzed pursuant to the same burden-shifting framework, "the definition of a disability under New York law is not coterminous with the ADA definition," as will be discussed in further detail *infra*. *Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) (citing, *inter alia*, *State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213 (1985)).

**B.**     *Application to Plaintiff's Discrimination Claim*

Consistent with the requirements of *McDonnell Douglas*, this Court will first analyze whether plaintiff has established a *prima facie* case of discrimination. Here, defendant does not argue that plaintiff fails to meet either the first or third requirements of a *prima facie* case. Defendant does contend, however, that plaintiff cannot establish a *prima facie* case because he does not suffer from a disability as defined by the ADA and cannot show that he was fired because of his disability.

*Plaintiff's Alleged Disability*

A person can demonstrate that he has a disability within the meaning of the ADA in any one of three ways. He can show that he (1) has a physical or mental impairment that "substantially limits" one or more "major life activities"; (2) has a "record of such an impairment"; or (3) is "regarded as" having such an impairment. 42 U.S.C. § 12102(1). Disability determinations are made on a case by case basis. *Reeves*, 140 F.3d at 151–52.

Here, plaintiff asserts that he qualifies as disabled under the first definition. Under that definition, (1) a plaintiff must show that he suffers from a physical or mental impairment; (2) the plaintiff must identify the activity that is claimed to be impaired and establish that such activity constitutes a "major life" activity; and (3) the plaintiff must show that his physical or mental impairment "substantially limits" the identified "major life activity." *Jacques,* 386 F.3d at 201; *accord Ramirez v. New York City Bd. of Educ.,* 481 F. Supp. 2d 209, 217 (E.D.N.Y. 2007). "[A] major life activity . . . includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Moreover, "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Furthermore, "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity," and "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

Here, plaintiff alleges that he suffered a physical impairment because he suffered from severe aortic regurgitation ("SAR"), which required him to undergo "open heart surgery and a valve replacement." (Pl.'s Mem. in Opp'n at 8.) According to plaintiff, "it is hardly disputable that the functioning of the heart is part of the 'operation of a major bodily function.'" (*Id.*) Moreover, plaintiff claims that "[b]y mid 2009, plaintiff's disease had progressed to the point that the function of his circulatory system was substantially limited in comparison to that of a normal individual." (*Id.* at 10.) In order to support this assertion, plaintiff relies on the

declaration of Jacob M. Meron, a cardiologist at North Shore Cardiology and Internal Medicine Associates, P.C., who at the time this motion was filed had been plaintiff's treating cardiologist for the past nine years. (Meron Decl. ¶¶ 1-2.) According to Dr. Meron, in "mid 2009, [plaintiff's] disease became severe" and "[t]he function of his heart, and hence, his circulatory system, was substantially impaired compared with the heart function of a normal individual." (*Id*. ¶ 4.) Defendant, however, claims that "plaintiff's alleged 'physical impairment' did not come close to substantially limiting any 'major life activity' " because plaintiff testified at his deposition that his disability did not affect his performance other than that he felt a "little bit lethargic" when he did not take his medication. (Defs.' Mem. in Supp. at 9-11.)

Although defendant validly points out that plaintiff's claimed disability has not affected his performance at work, the Court must be guided by the clear language of the ADA. According to that statute, major life activities are not limited to walking, standing, and working, *inter alia*, but "also include[] the operation of . . . circulatory . . . functions." 42 U.S.C. § 12102(2)(B). As plaintiff's treating physician points out, plaintiff suffered from severe aortic insufficiency, which affected the function of his circulatory system. Furthermore, Dr. Meron assessed plaintiff's heart function as being substantially impaired compared to that of a normal individual. As a result, a reasonable trier of fact could conclude that plaintiff suffered from a disability under the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(iii) (noting *inter alia* that cancer substantially limits cell growth, diabetes substantially limits endocrine function, and HIV substantially limits immune function); *see also Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1374-75 (N. D. Georgia 2012) (finding that plaintiff was disabled because her breast disease substantially limited normal cell growth, endocrine, and reproductive function).

Moreover plaintiff has presented a *prima facie* case that he was disabled under NYSHRL.

A disability under the NYSHRL is a condition that either (1) prevents the exercise of a normal bodily function or (2) is "demonstrable by medically accepted clinical or laboratory diagnostic techniques." *Reeves*, 140 F.3d at 155. "Thus, an individual can be disabled under the [Human Rights Law] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities." *Lovely H. v. Eggleston,* 235 F.R.D. 248, 260 (S.D.N.Y. 2006) (quoting *Hazeldine v. Beverage Media Ltd.,* 954 F. Supp. 697, 706 (S.D.N.Y. 1997). In other words, any "medically diagnosable impairment" is a disability under the NYSHRL. *Barr v. New York City Trans. Auth.,* 2002 WL 257823, at *8 (E.D.N.Y. Feb. 20, 2002). Here, plaintiff has presented evidence of the existence of a medically diagnosable impairment, his severe aortic insufficiency. The Court will now focus on what the federal regulations direct should be the primary matter of its attention, whether discrimination has occurred. *See* 29 C.F.R. § 1630.2(j)(1)(iii).

*Plaintiff's Allegations of Discrimination*

Defendant contends mainly that "plaintiff cannot show that he was fired because of his disability because AAPMS decided to terminate plaintiff prior to becoming aware of plaintiff's alleged disability." (Def.'s Mem. in Supp. at 13.) In particular, defendant claims that "[d]iscussions concerning the termination of [plaintiff] took place several weeks prior to the ad [resulting in Vicente's hiring] being placed" and "plaintiff never informed anybody at AAPMS about any health condition until after this ad was placed." (*Id*. at 13-14.) Plaintiff responds, however, that "the proximity of the adverse employment action to plaintiff's revelation of his need for surgery, combined with Zerbo's comments about plaintiff's illness, give rise to an inference of discrimination." (Pl.'s Mem. in Opp'n at 12.)

Addressing first plaintiff's proximity argument, courts in this circuit have held that the

12

temporal proximity of an employee's disclosure of a disability to his termination support an inference of discrimination. *See e.g.*, *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 260 (S.D.N.Y. 2009); *Trent v. Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013). Here, plaintiff alleges that he told Zerbo about his need for surgery approximately 5-6 weeks prior to his termination. This proximity coupled with Zerbo's comment to the plaintiff, "you're sick and this is a business decision" could lead a reasonable trier of fact to infer that defendant discriminated against plaintiff. Moreover, defendant's argument that Zerbo's comment was a "stray remark" is unavailing. (Def.'s Reply at 1-2.) Although, stray remarks, even by a decision-maker, without a demonstrated nexus to the adverse action will not defeat a motion for summary judgment, plaintiffs have provided sufficient evidence of that nexus here. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Malatesta v. Credit Lyonnais*, 2005 WL 3117351, at *5 (S.D.N.Y. Nov. 21, 2005). Here, the alleged comment in referring to plaintiff as "sick" directly references plaintiff's disability. In addition, according to plaintiff, Zerbo's comment was in direct response to plaintiff's inquiry as to whether he was going to be fired. Furthermore, plaintiff states that this conversation took place no later than August 1, 2009, approximately 6 weeks prior to his termination. Based on these facts, a reasonable trier of fact could infer that defendant discriminated against plaintiff because of his disability.

*Pretext*

Here, plaintiff concedes that defendant has articulated a legitimate, non-discriminatory rationale for terminating the plaintiff, namely that defendant "decided to terminate plaintiff in June, 2009, for performance reasons and before it knew of plaintiff's need for surgery." (Pl.'s Mem. in Opp'n at 13.) As noted previously, once an allegedly discriminatory employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the

burden of showing that the stated reason was pretextual, and that more likely than not discrimination motivated the adverse employment action. An employment discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner–Lambert Co.,* 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951–52 (3d Cir. 1996)). However, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight" if he is to withstand summary judgment. *Smith v. Am. Exp. Co.,* 853 F.2d 151, 155 (2d Cir. 1988).

In their submissions, both parties dispute the relevance of *Primmer v. CBS Studios, Inc.*, 667. F. Supp. 2d 248 (S.D.N.Y. 2009) to the pretext analysis. In that case, plaintiff brought suit under the ADA against her employer for her termination shortly after she suffered a brain aneurysm. There the defendant argued that "because it had already decided not to renew [plaintiff's] employment contract before the aneurysm, it could not have made that decision as a result of the aneurysm." *Id*. at 259. The court found, however, that plaintiff raised genuine issues of material fact that discrimination motivated plaintiff's termination because one of plaintiff's supervisors made a comment regarding plaintiff's physical condition at the meeting where she was told of her termination and this meeting took place in close temporal proximity to when she suffered the aneurysm. In addition, the Court noted that plaintiff "was never advised that her performance was unsatisfactory or that her continued employment was in jeopardy" and that "the record . . . [was] absolutely devoid of any contemporaneous writings – be they internal

14

memoranda, emails or diary entries – that show any indication that any of [plaintiff's] direct supervisors was dissatisfied with her performance prior to her aneurysm." *Id*. at 259-60.

Defendant contends that *Primmer* is distinguishable from this case in that defendant "voiced its concerns [about plaintiff's] multiple issues and errors." (Def.'s Reply at 8.) In addition, defendant points out that unlike here, in *Primmer* the "plaintiff received a raise and a renewed contract shortly before she disclosed her illness and after the employer had allegedly already began to 'feel disappointed' with plaintiff's work." (*Id*.) Finally, defendant contends that unlike in *Primmer*, here defendant has produced emails indicating that it was dissatisfied with plaintiff's work. (*Id*. at 8-9.)

Here, however, plaintiff has raised genuine issues of material fact that defendant's proffered reasons for firing him were pretextual. Like in *Primmer*, the comment from plaintiff's supervisor, Zerbo, coupled with the temporal proximity between the time when plaintiff told Zerbo about his need for surgery and his termination raises an inference of discrimination. In addition, although plaintiff's supervisors may have sent plaintiff emails expressing their dissatisfaction, there are no internal documents noting that plaintiff's employment was in jeopardy or that defendant ever expressed the same to plaintiff. Furthermore, there is no dispute that when plaintiff took over as Assistant Controller, his hiring form clearly indicated that he was replacing the individual who formerly held that position. That Vicente's hiring form did not indicate that she was replacing plaintiff and listed an entirely different position from plaintiff's as her job title, along with defendant's failure to terminate plaintiff until months after it hired Vicente casts doubt on defendant's position that it had already decided to fire plaintiff prior to hiring Vicente. As a result, a reasonable trier of fact could conclude that discrimination was a motivating factor for plaintiff's termination. Therefore, plaintiff's discrimination claim survives

defendant's summary judgment motion.

## III. Plaintiff's Spoliation Claim Limited to Defendant's Summary Judgment Application

Plaintiff claims that "defendant was on notice of possible litigation by plaintiff as of the date of plaintiff's termination" and that Givelekian's instruction "to preserve only evidence that would show mistakes made by plaintiff during his employment" was in error. (Pl.'s Mem. in Opp'n at 18.) According to plaintiff, those emails that were not saved "would have provided support for plaintiff's case," (*Id.* at 18-19), because they would have shown "tasks that plaintiff had successfully completed" and that the problems that defendant blames plaintiff for were actually caused by external factors. (Pl.'s R. 56.1 ¶¶ 65-66.) Plaintiff claims that the "destruction or non-production of these emails would entitle plaintiff to an adverse inference and provides an additional and further ground[] for the denial of summary judgment." (Pl.'s Mem. in Opp'n at 19.) Since the Court has already found that plaintiff has raised genuine issues of fact precluding summary judgment, however, plaintiff's argument is moot and the Court need not address it any further.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment pursuant to Rule 56 is denied in its entirety.

**SO ORDERED.**

Dated: Central Islip, New York

April 29, 2014          _____/s/_____

Denis R. Hurley

United States District Judge